1
2
3
4
5
6
7
8

**United States District Court**
For the Northern District of California

9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

KEITH W. CANDLER,                     )   No. C 05-4108 MMC (PR)
                                       )
                Plaintiff,             )   **ORDER GRANTING DEFENDANTS'**
                                       )   **MOTION FOR SUMMARY JUDGMENT**
        v.                             )   **AND MOTION TO DISMISS**
                                       )
                                       )   **(Docket Nos. 37, 65 & 66)**
M.S. EVANS, et al.,                    )
                                       )
                Defendants.            )
_____)

On October 12, 2005, plaintiff, a California prisoner incarcerated at Salinas Valley

State Prison ("SVSP") and proceeding pro se, filed the above-titled civil rights action

pursuant to 42 U.S.C. § 1983.  On December 11, 2006, the Court ordered the complaint

served on defendants Captain J.W. Lewis ("Lewis"), Sergeant B. O'Kane ("O'Kane"),

Lieutenant J. Hughes ("Hughes"), Correctional Officer W. Wilson ("Wilson"), Nurse M.

Ayaay ("Ayaay"), Nurse Zingler ("Zingler") and Correctional Officer J.J. McAnelly

("McAnelly").  Defendants were directed to file a dispositive motion or, in the alternative, a

notice indicating they are of the opinion such a motion is not warranted.

        Now before the Court are the following motions: (1) defendants Lewis, O'Kane,

Hughes, Wilson and Ayaay's motion for summary judgment,[1] and (2) defendant McAnelly's

motion to dismiss the complaint on the ground plaintiff has failed to exhaust his

_____

[1]On May 18, 2007, the Court dismissed the complaint against defendant Zingler
without prejudice after plaintiff failed to effect service on Zingler pursuant to Federal Rule of
Civil Procedure 4(m).

**United States District Court**
For the Northern District of California

1 administrative remedies.  Plaintiff has opposed both motions; he has also filed a motion "for

2 reconsideration," which the Court construes as a motion for leave to file a supplemental

3 opposition to McAnelly's motion to dismiss.  The Court, having read and considered the

4 papers filed in support of and in opposition to the parties' motions, rules as follows.

**DISCUSSION**

6 A.   Defendants Lewis, Hughes, O'Kane, Wilson and Ayaay's Motion for
     Summary Judgment

Plaintiff alleges in his complaint that defendants Lewis, O'Kane, Hughes, Wilson and

Ayaay, knowing that he suffered from asthma, unlawfully exposed him to oleoresin capsicum

spray ("OC")[2] and failed to provide him with medical care once he had been exposed.  Upon

reviewing the complaint, the Court previously found plaintiff's allegations, when liberally

construed, state a claim for the violation of plaintiff's rights under the Eighth Amendment.[3]

B.   Plaintiff's Statement of Facts

On January 1, 2005, defendant O'Kane transferred plaintiff to the cell next door to an

inmate named "Hall."  On February 3, 2005, defendant Wilson ordered Hall to remove paper

that Hall had used to cover his windows.  When Hall refused, Wilson informed Hall that he

would be forcibly extracted from the cell.  Plaintiff explained to Wilson that plaintiff suffered

from asthma and that he needed to be moved from his cell before Hall was extracted, because

he would be exposed to OC that would be sprayed into Hall's cell as a result of the two cells

sharing an air vent.  Wilson told plaintiff that "it would be quick," and left.  (Compl. at 4.)

[2]Although plaintiff states in his complaint that he was exposed to "chemical spray," defendants have clarified that the chemical used was OC, which defendants also refer to as "pepper spray".

[3]When construing the allegations in plaintiff's complaint, the Court noted: "Deliberate indifference to an inmate's safety or serious medical needs violates the Eighth Amendment's proscription against cruel and unusual punishment.  See Farmer v. Brennan, 511 U.S. 825, 832 (1994) (addressing safety conditions in prison); Estelle v. Gamble, 429 U.S. 97, 104 (1976) (addressing medical needs)."  (Order, filed Mar. 31, 2006, at 3.)  In their motion for summary judgment, defendants have addressed plaintiff's claim as one for deliberate indifference to plaintiff's serious medical needs.  Support for analyzing plaintiff's claim as such, rather than as a claim for deliberate indifference to plaintiff's safety, is found in plaintiff's allegations that defendants should not have exposed him to OC because they knew he had asthma and should not have refused to treat him for symptoms caused by OC exposure.

2

1    O'Kane then came to Hall's cell and ordered Hall to remove the window covering.

2    Plaintiff explained to O'Kane that he had asthma and needed to be moved from his cell

3    before the extraction; O'Kane told plaintiff that "you need a little gas anyway," and left.

4    (Compl. at 5.)  O'Kane, Wilson, Lewis and Hughes thereafter extracted Hall from his cell

5    using OC.  The OC blew into plaintiff's cell, causing plaintiff to cough, vomit and feel

6    burning in his eyes, even though plaintiff went to the back of the cell and got under his bed.

7    (Id.)

8    Approximately an hour later, when Wilson returned to clean up Hall's cell, plaintiff

9    called out to Wilson, asking him to get plaintiff medical attention, and also to turn off one of

10   the blowers to allow plaintiff some fresh air.  Wilson did not respond to plaintiff.  (Compl. at

11   5-6.)

12   At approximately 6:30 p.m., nurses Ayaay and Zingler visited plaintiff to give him his

13   psychiatric medication.  He told them he had been exposed to OC and as a result his eyes,

14   throat and nose were burning, and he had stomach and head pain.  He requested medical

15   attention, but his request was denied.  (Compl. at 6-7.)  As a result of his exposure to OC, for

16   approximately three days plaintiff suffered burning in his throat and nostrils, had headaches

17   and stomach pains, had trouble sleeping and had to use his asthma inhaler "constantly."

18   (Compl. at 7-8.)

19   C.    Defendants' Statement of Facts

20   On February 3, 2005, plaintiff was in the Enhanced Outpatient Program ("EOP"),

21   which provides the most intensive level of outpatient mental-health care in the California

22   Department of Corrections and Rehabilitation's Mental Health Services Delivery Program

23   for mentally ill inmates.  (Decl. M. Ayaay Supp. Mot. Summ. J. ("Ayaay Decl.") ¶ 4.)

24   Plaintiff was housed in the cell next to inmate Hall.

25   When Wilson noticed Hall had covered his cell-door window with paper, Wilson

26   unsuccessfully asked Hall to remove the paper.  (Decl. W. Wilson Supp. Mot. Summ. J.

27   ("Wilson Decl.") ¶ 3.)  When Hall refused, Wilson, pursuant to SVSP's Use of Force

28   Procedure ("UFP") 14.5.7, notified the Facility Sergeant, defendant O'Kane, of the situation.

1    (Id.; Decl. B. O'Kane Supp. Mot. Summ. J. ("O'Kane Decl.") ¶ 3.)[4]

2    After a psychologist unsuccessfully conducted an intervention with Hall, O'Kane,

3    pursuant to UFP 14.5.7, notified the Facility Lieutenant, defendant Hughes, of the incident.

4    (O'Kane Decl. ¶ 3; Decl. J. Hughes Supp. Mot. Summ. J. ("Hughes Decl.") ¶ 3.)

5    Hall's refusal to remove the paper from his cell-door window and to submit to

6    handcuffs presented a threat to the safety and security of the institution, and required a

7    tactical cell extraction under UFP 14.5.1. (Decl. G. Lewis Supp. Mot. Summ. J. ("Lewis

8    Decl.") ¶ 3; Hughes Decl. ¶ 3; O'Kane Decl. ¶ 6.) Hughes notified the Facility Captain,

9    defendant Lewis, of the situation. (Lewis Decl. ¶ 3; Hughes Decl. ¶ 3). Lewis authorized a

10   calculated cell extraction, and instructed O'Kane to assemble a Tactical Cell Extraction

11   Team to remove Hall from his cell. (Lewis Decl.¶ 3; Hughes Decl. ¶ 3; O'Kane Decl. ¶ 3,)

12   Under UFP 14.5.7., Hughes undertook steps to prepare for the anticipated extraction,

13   which included ordering the facility's heating, ventilation and air-conditioning system

14   ("HVAC") to be shut off. (Hughes Decl. ¶ 5; Lewis Decl. ¶ 5; O'Kane Decl. ¶ 4,;Wilson

15   Decl. ¶ 5.) Shutting off the HVAC system prevents air from circulating between cells

16   through the ventilation system, such that the only OC spray to spread into the facility would

17   escape from the cell door of the inmate being extracted. (Decl. D. Barchacky Supp. Mot.

18   Summ. J. ("Barchacky Decl." ¶¶ 3-4.)

19   O'Kane assembled the cell-extraction team under UFP 14.5.7. (O'Kane Decl. ¶ 4;

20   Wilson Decl. ¶ 3.) O'Kane was the Tactical Cell Extraction Team Sergeant, Hughes was the

21   Team Leader, Lewis was the extraction supervisor, and Wilson was the Camera Operator.

22   (Wilson Decl. ¶ 4; O'Kane Decl. ¶ 4; Hughes Decl. ¶ 4; Lewis Decl. ¶ 4.) Registered nurse

23   Wendling was also on the cell-extraction team as the Medical Technical Assistant ("MTA"),

24   whose duty under UFP 14.5.7 is to monitor inmates for OC exposure and medical problems.

25   (Id.)

26   Hughes issued final instructions to Hall under UFP 14.5.7., requesting that Hall

27

28        [4]By leave of Court, defendants filed SVSP's UFP under seal.

4

comply with staff orders and remove his cell-window coverings and submit to handcuffs; when Hall refused, Hughes instructed O'Kane to proceed.  (Wilson Decl. ¶ 6; O'Kane Decl. ¶ 5; Hughes Decl. ¶ 6; Lewis Decl. ¶ 6.)

UFP 14.5 clarifies that the objective of an extraction is to remove an inmate using only the reasonable and necessary force and to minimize the risk of injury to staff and inmates.  (UFP at 7.)  If an inmate will not comply with the cell-extraction team's instructions, the next preferred step is to gain compliance through the use of OC spray as opposed to the use of physical force.  (UFP at 10, 14.)  The UFP does not require notice to other inmates in the facility or the evacuation of inmates before the use of OC.  (Wilson Decl. ¶ 11; O'Kane Decl. ¶ 10; Hughes Decl. ¶ 11; Lewis Decl. ¶ 11.)  Removing all inmates in a unit before the use of OC would create an "enormous and unnecessary" security risk to prison staff, other inmates, and the institution as a whole.  (Id.)  Mass evacuations are neither practical nor feasible due to, among other factors, time limitations, the lack of available cells for transferring inmates, and the lack of staff to monitor and accomplish such a large task in an efficient, safe and secure manner.  (Id.)

Plaintiff did not advise Hughes or Lewis that he had an asthma condition, and he did not ask Hughes or Lewis to move him from his cell before the extraction.  (Hughes Decl. ¶ 10, Lewis Decl. ¶ 10.)

O'Kane administered OC spray through the food port of Hall's cell door with one 5.5 Fogger (a metal can carried on a duty belt that emits oily OC spray when triggered), and then unsuccessfully ordered Hall to remove the window coverings and turn on his cell lights. (Wilson Decl. ¶ 7, O'Kane ¶ 5, Hughes Decl. ¶ 7, Lewis Decl. ¶ 7.)  O'Kane next administered OC spray through the food port of Hall's cell door with one T-16 Expulsion Grenade (which releases OC in powder form), and, unsuccessfully, ordered Hall to remove the window coverings.  (Id.)  O'Kane next administered OC spray through the food port of Hall's cell door with one MK-46 (which emits oily OC spray like the 5.5 Fogger, but contains a larger volume of OC), and, again unsuccessfully, ordered Hall to remove his cell door's window coverings and to turn on the cell light.  (Id.)  O'Kane once again administered

United States District Court
For the Northern District of California

1   OC spray through the food port of Hall's cell door with one MK-46, and repeated his

2   previous orders to Hall, again without succeeding in obtaining Hall's compliance.  (Id.)

3   O'Kane was in the process of inserting the X-10 Barrier Removal Device (which is a large

4   metal pole used to knock down obstructions), when Hall turned on his cell lights.  O'Kane

5   put down the X-10 Barrier Removal Device and successfully ordered Hall to remove the

6   sheet and window coverings, and to back up to the cell-door food port for the application of

7   restraints. (Id.)  All of the above-described uses of OC were in accordance with UFP 14.5.7.

8   (UFP at 9-15.)

9        After Hall was extracted from his cell Hughes ordered the facility's exhaust fans to be

10  placed on "high" for approximately one hour, in order to flush air-borne chemical agents out

11  of the entire facility, pursuant to UFP 14.5.7.  (Wilson Decl. ¶ 8; O'Kane Decl. ¶ 7; Hughes

12  Decl. ¶ 8; Lewis Decl. ¶ 8.)  To place the exhaust fans on high, the HVAC control-booth

13  operator sets the HVAC to "purge," which setting turns on the dayroom fans to pull any

14  remaining chemical agents from the extracted inmate's cell door up and out of the facility's

15  ceiling.  (Barchacky Decl. ¶ 5.)  After Hughes ordered the fans placed on high, and the OC

16  had been flushed from the facility, the HVAC system was re-engaged to "automatic."

17  (Wilson Decl. ¶  8; O'Kane Decl. ¶ 7; Hughes Decl. ¶ 8; Lewis Decl. ¶ 8; Barchacky Decl. ¶

18  5.)

19       UFP 14.5.7 provides that inmates directly exposed to OC shall be decontaminated by

20  exposure to fresh moving air or water.  (Wilson Decl. ¶ 9; O'Kane Decl. ¶ 8; Hughes Decl. ¶

21  9; Lewis Decl. ¶ 9.)  Hall was directly exposed to OC because he was in the cell where it had

22  been administered; consequently, Hall was escorted to the yard and permitted to wash water

23  over his face; he was then medically cleared by the MTA.  (Id.)  No other inmate had been

24  directly exposed to OC or had requested medical assistance, including plaintiff.  (Id.)

25  Further, Wilson, O'Kane, Hughes and Lewis noticed no inmate other than Hall exhibiting

26  obvious, physical effects from the use of OC, and at no time immediately before, during or

27  after Hall's extraction did they hear any inmate, including plaintiff, request medical

28  assistance or complain in any way of exposure to OC.  (Wilson Decl. ¶ 10; O'Kane Decl. ¶ 9;

6

**United States District Court**
For the Northern District of California

1    Hughes Decl. ¶ 10; Lewis Decl. ¶ 10.)  Additionally, at no time immediately before, during

2    or after Hall's extraction was Wilson, O'Kane, Hughes or Lewis advised by the MTA or any

3    other officer present during the extraction that any bystander inmate, including plaintiff, was

4    exhibiting obvious, physical effects from use of the OC.  (Id.)

5           Hughes, in his discretion as Team Leader, determined that other inmates in the

6    facility, including plaintiff, who had not been directly exposed to OC did not require formal

7    decontamination by medical personnel.  (Hughes Decl. ¶ 9.)  Lewis, in his discretion as Team

8    Supervisor, agreed with Hughes's determination.  (Lewis Decl. ¶ 9.)

9           Approximately three hours after the extraction, between 6:00 p.m. and 8:00 p.m. that

10   evening, Wilson escorted Ayaay, a Licensed Vocational Nurse ("LVN"), through the facility

11   in order that Ayaay could distribute over-the-counter medications to inmates.  (Wilson Decl.

12   ¶ 13; Decl. M. Ayaay Supp. Mot. Summ. J. ("Ayaay Decl.") ¶¶ 1, 4.)  Plaintiff complained to

13   Ayaay of symptoms brought on by OC exposure.  (Id.)  When plaintiff spoke to Ayaay, he

14   was calm and his speech and respiratory functions appeared to Ayaay to be normal and

15   unaffected; plaintiff's eyes were not red or watery, as they would be after exposure to OC.

16   (Ayaay Decl. ¶¶ 3-4.)  Ayaay therefore determined that plaintiff was not experiencing any

17   serious or overt symptoms due to OC exposure.  (Id. ¶ 4.)  Ayaay did, however, offer plaintiff

18   a sick-call slip for a non-emergency medical visit.  (Id.; Wilson Decl. ¶ 13.)  Wilson, who is

19   familiar with the effects of OC because of his experience as a correctional officer, agreed

20   with Ayaay that plaintiff was not visibly suffering from any symptoms of OC exposure.

21   (Wilson Decl. ¶ 13.)  Plaintiff filled out the sick-call slip on February 4, 2005, the day

22   following Hall's cell extraction.  (Ayaay Decl. ¶ 7.)  Plaintiff indicated in the form that he

23   was suffering from a cough, sore throat, runny nose and headaches due to exposure to OC the

24   day before.  (Id.)[5]  In Ayaay's opinion, such symptoms are consistent with a common cold

25

26           [5]There is no evidence that plaintiff was seen by a health care provider on February 4,
     2005.  The SVSP records indicate plaintiff was scheduled for a medical appointment on
27   February 15, 2005 for the symptoms stated in his sick-call slip, and that on that date he spoke
     to a registered nurse but refused to pay the $5.00 co-payment to see a doctor.  (Ayaay Decl. ¶
28   8.)  There is no evidence that plaintiff was experiencing any symptoms at that time.

1    and do not constitute a medical emergency.  (Id.)

2    D.    Legal Standard

3          Summary judgment is proper where the pleadings, discovery and affidavits show there

4    is "no genuine issue as to any material fact and that the moving party is entitled to judgment

5    as a matter of law."  See Fed. R. Civ. P. 56(c).  Material facts are those that may affect the

6    outcome of the case.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A

7    dispute as to a material fact is genuine if the evidence is such that a reasonable jury could

8    return a verdict for the nonmoving party.  See id.

9          The court will grant summary judgment "against a party who fails to make a showing

10   sufficient to establish the existence of an element essential to that party's case, and on which

11   that party will bear the burden of proof at trial[,] . . . since a complete failure of proof

12   concerning an essential element of the nonmoving party's case necessarily renders all other

13   facts immaterial."  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); see also

14   Anderson v. Liberty Lobby, 477 U.S. at 248 (holding fact is material if it might affect

15   outcome of suit under governing law; further holding dispute about material fact is genuine

16   "if the evidence is such that a reasonable jury could return a verdict for the nonmoving

17   party").  The moving party bears the initial burden of identifying those portions of the record

18   that demonstrate the absence of a genuine issue of material fact.  The burden then shifts to

19   the nonmoving party to "go beyond the pleadings, and by his own affidavits, or by the

20   'depositions, answers to interrogatories, or admissions on file,' designate 'specific facts

21   showing that there is a genuine issue for trial.'"  See Celotex, 477 U.S. at 324 (citing Fed. R.

22   Civ. P. 56(e)).

23         In considering a motion for summary judgment, the court must view the evidence in

24   the light most favorable to the nonmoving party; if, as to any given fact, evidence produced

25   by the moving party conflicts with evidence produced by the nonmoving party, the court

26   must assume the truth of the evidence set forth by the nonmoving party with respect to that

27   fact.  See Leslie v. Grupo ICA, 198 F.3d 1152, 1158 (9th Cir. 1999).  The court's function on

28   a summary judgment motion is not to make credibility determinations or weigh conflicting

United States District Court
For the Northern District of California

1    evidence with respect to a disputed material fact.  See T.W. Elec. Serv. v. Pacific Elec.

2    Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).

3    E.    Discovery

4            Defendants have moved for summary judgment on the ground there is no genuine

5    issue as to any material fact and they are entitled to judgment as a matter of law, and also on

6    the ground they are entitled to qualified immunity.  After filing their motion for summary

7    judgment, and before plaintiff filed his opposition thereto, defendants requested a stay of all

8    outstanding and further discovery pending a ruling on the issue of qualified immunity; the

9    request was made shortly after plaintiff filed a motion to compel defendants to respond to

10   certain interrogatories and to produce confidential documents.  The Court granted

11   defendants' request for a stay and denied without prejudice plaintiff's motion to compel.

12   Thereafter, plaintiff filed an opposition to the motion for summary judgment; in support of

13   his opposition plaintiff has submitted legal argument, his own declaration attesting to facts

14   contradicting those put forth by defendants in support of their motion for summary judgment,

15   and more than sixty pages of exhibits.

16           The pending stay of discovery does not require the Court to postpone ruling on the

17   motion for summary judgment; plaintiff has produced ample evidence in support of his

18   opposition and does not seek discovery that could elicit evidence that would raise genuine

19   issues of material fact as to whether defendants acted with deliberate indifference to

20   plaintiff's serious medical needs.  See Klingele v. Eikenberry, 849 F.2d 409, 412 (9th Cir.

21   1988).[6]  Consequently, the Court need not defer ruling on the motion for summary judgment,

22

23           [6]Specifically, plaintiff seeks answers to interrogatories that ask for (1) the names of
     individuals who trained defendant O'Kane as to the amount of OC to be used in cell
24   extractions; (2) an explanation as to why an internal affairs or security investigation was not
     conducted into plaintiff's administrative appeal about the cell extraction; and (3) a response
25   from defendant Ayaay as to whether she conducted a "reasonable inquiry" into plaintiff's
     request for defendant Zingler's first and middle initials.  None of the information sought by
26   these interrogatories could elicit evidence that would raise genuine issues of material fact as
     to whether defendants acted with deliberate indifference to plaintiff's serious medical needs
27   when refusing to move plaintiff or to respond to his request for medical care.  Further, with
     respect to the third interrogatory, plaintiff states no reason why Ayaay should be required to
28   provide any personal information with respect to nurse Zingler, who, as noted above, was

United States District Court
For the Northern District of California

and, as discussed below, finds defendants are entitled to summary judgment on plaintiff's deliberate indifference claims.

F.      Plaintiff's Claims

        Plaintiff alleges that defendants acted with deliberate indifference to his serious medical needs when they refused to move him from his cell both before and during their use of OC in connection with Hall's cell extraction, even though they knew plaintiff had asthma, and then refused to provide him with medical care after the cell extraction, even though he complained of symptoms of OC exposure.

        Deliberate indifference to a prisoner's serious medical needs violates the Eighth Amendment's proscription against cruel and unusual punishment.  See Estelle v. Gamble, 429 U.S. 97, 104 (1976).  A determination of "deliberate indifference" involves an examination of two elements: the seriousness of the prisoner's medical need and the nature of the defendant's response to that need.  McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992), overruled on other grounds, WMX Technologies, Inc. v. Miller, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc).

        A prison official is deliberately indifferent if he knows that a prisoner faces a substantial risk of serious harm and disregards that risk by failing to take reasonable steps to abate it.  Farmer v. Brennan, 511 U.S. 825, 837 (1994).  The prison official must not only "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," but "must also draw the inference."  Id.  Neither negligence nor gross negligence will constitute deliberate indifference.  Id. at 835-36 & n.4.  Consequently, in order for deliberate indifference to a prisoner's serious medical needs to be established, there must exist both a purposeful act or failure to act on the part of the defendant and harm

_____

dismissed from this action on May 18, 2007.
        Plaintiff also seeks production of confidential SVSP policies governing the use of OC during cell extraction procedures.  Plaintiff does not, however, require such documents in order to raise genuine issues of material fact as to whether defendants acted with deliberate indifference to plaintiff's serious medical needs; in their declarations, defendants have described in detail the procedures they followed pursuant to SVSP's UFP pertaining to the use of OC during cell extractions, and that description is consistent with the document itself.

**United States District Court**
For the Northern District of California

1    resulting therefrom.  See <u>McGuckin</u>, 974 F.2d at 1060.

2    For the reasons stated below, the Court finds plaintiff has not raised a triable issue of

3    fact as to whether defendants consciously disregarded a serious medical need or a substantial

4    risk of serious harm to his health either by refusing to move him from his cell before or

5    during their use of OC in connection with Hall's cell extraction, or by refusing to provide

6    him with medical care after the cell extraction when he complained of symptoms of OC

7    exposure.

8        1.    <u>Refusal to Move Plaintiff from his Cell Before or During OC Use</u>

9    Plaintiff alleges that defendants acted with deliberate indifference to his serious

10   medical needs by refusing to move him from his cell before and during Hall's cell extraction.

11   Defendants argue they did not know of and disregard a substantial risk to plaintiff's health

12   because: (1) plaintiff did not tell them he suffered from asthma and needed to be moved prior

13   to Hall's cell extraction; (2) it has not been shown that asthma symptoms are exacerbated by

14   exposure to OC; (3) defendants took precautionary measures to limit the potential for

15   exposure to OC for bystander inmates other than Hall; and (4) defendants were not aware

16   that plaintiff was suffering from symptoms of OC exposure during the cell extraction.

17   With respect to defendants' first argument that plaintiff did not tell them he had

18   asthma and needed to be moved, plaintiff states in his verified complaint and his declaration

19   in support of his opposition that he did inform defendants Wilson and O'Kane of both of

20   these facts prior to Hall's cell extraction.  As these material facts are directly contested, the

21   Court must view the evidence in the light most favorable to plaintiff and assume that the facts

22   set forth by plaintiff are true.  See <u>Leslie</u>, 198 F.3d at 1158.

23   Defendants next argue it has not been shown that asthma symptoms are exacerbated

24   by OC exposure, and, consequently, OC exposure cannot present a substantial risk to

25   plaintiff's health.  In support of this argument, defendants have submitted an article that

26   discusses the results of a study conducted by the National Institute of Justice; the article was

27   published in December 2001 and is titled "Pepper Spray's Effect on a Suspect's Ability to

28   Breathe" (hereinafter, "the study").  (Mot. Summ. J. Attachment.)  In opposition, plaintiff

United States District Court
For the Northern District of California

1   argues that the study does not support the proposition that OC exposure cannot exacerbate

2   asthma symptoms.  The Court finds the study's conclusions with respect to the effects of OC

3   on individuals with asthma are sufficiently qualified that a genuine issue of material fact

4   exists as to whether asthma can be exacerbated by exposure to OC under the conditions

5   described by the parties herein.[7]  Accordingly, the Court must view the evidence in the light

6   most favorable to plaintiff and assume that exposure to OC can exacerbate asthma symptoms.

7       Defendants, assuming, arguendo, plaintiff did make his concerns about asthma known

8   to one or more of the defendants prior to their use of OC, next argue they had no reason to

9   anticipate any risk to plaintiff's health because they followed SVSP's UFP, which provides

10  precautionary measures to limit the spread of OC to ensure that any exposure to OC is

11  minimal, and also provides for medical supervision to identify and treat any serious

12  symptoms from OC exposure.  In particular, defendants have produced evidence showing

13  they took such precautionary steps by turning off the HVAC system before spraying OC into

14  Hall's cell; ensuring an MTA was present to identify and treat any inmate showing serious

15  symptoms of OC exposure; spraying OC into Hall's cell only through the food port in Hall's

16  cell door; re-engaging the HVAC system on a high setting after the extraction was

17  completed; and turning on dayroom fans in order to clear the air of any lingering OC.

---

18

19      [7]Out of a total of thirty-four subjects who participated in the study, only eight were
    part of a subgroup of subjects identified as having a history of "lung disease, asthma,
20  smoking, or respiratory inhaler medication use"; the number of subjects in the subgroup who
    had asthma is not identified.  (Study at 2, 4.)  With respect to the noted subgroup, the study
21  found that "OC exposure had no effect on pulmonary function in the sitting or restraint
    positions," and there was "no evidence of hypoxemia, hypercapnia, or hypoventilation after
    OC inhalation" in either the sitting or restraint positions.  (Study at 4.)  The study
22  acknowledged, however, that "while these results suggest that OC exposure does not result in
    respiratory dysfunction in those with potential respiratory abnormalities, it is important to
23  note that this study cannot make definitive conclusions due to the small number of subjects
    (eight) in this subgroup."  (Study at 4-5.)  The study also noted its own limitations, including:
24  it was conducted on people in a laboratory, not "subjects in the field," who may be more
    prone to complications; it did not examine the effects of repeated OC exposure, which
25  commonly occurs in the field setting; and it did not assess subjects for delayed or long-term
    effects from OC exposure.  (Study at 5-6.)  Finally, of particular relevance here, is the
26  following conclusion reached by the study: "[I]t is important to emphasize the limited nature
    of the additional analyses performed on the subgroups of subjects who were overweight or
27  had potential respiratory abnormalities.  These groups were small in number and the analysis
    in this study lacked sufficient statistical power to make any definite conclusive findings."
28  (Study at 6.)

United States District Court
For the Northern District of California

1    Additionally, defendants have produced evidence that after the extraction, with the exception

2    of Hall, who required decontamination, no inmate other than plaintiff complained of OC

3    exposure.  Plaintiff has not produced any evidence that contradicts defendants' evidence that

4    they took such precautionary steps and that no other inmate complained of OC exposure.

5         The undisputed evidence set forth above demonstrates, as a matter of law, that

6    defendants did not act with deliberate indifference to plaintiff's serious medical needs;

7    specifically, by following the UFP and taking precautionary measures to minimize and treat

8    bystander exposure to OC, defendants lacked the requisite state of mind to establish an

9    Eighth Amendment violation.  Put another way, even if defendants knew plaintiff suffered

10   from asthma and refused to move him from his cell prior to using OC, they acted in

11   reasonable reliance on procedures designed to avoid any significant risk to plaintiff and thus

12   their failure to move plaintiff prior to Hall's cell extraction did not rise to the level of

13   deliberate indifference.[8]

14        Finally, defendants argue they cannot be found to have acted with deliberate

15   indifference to plaintiff's serious medical needs during the time that Hall's cell extraction

16   was taking place, because they were not aware that plaintiff had been exposed to OC or that

17   he required medical attention.  In his declaration in opposition to the motion for summary

18   judgment, plaintiff concedes that he did not seek medical attention from defendants or

19   anyone else during or immediately after the cell extraction.  (Pl.'s Decl. Opp. Mot. Summ. J.

20   at 4.)  The undisputed evidence thus shows that defendants did not act with deliberate

21   indifference to plaintiff's serious medical needs by failing to move him from his cell or

22   provide him with medical care during Hall's cell extraction.

23        For the reasons stated above, the Court finds defendants did not know of and disregard

24

25        [8]The Court recognizes that prison officials cannot avoid liability by blindly following
     a policy that is constitutionally infirm.  See Way v. County of Ventura, 445 F.3d 1157, 1166
26   (9th Cir. 2006).  Here, however, there is no allegation that the procedures adopted in the UFP
     pertaining to the use of OC are unconstitutional.  Cf. California Attorneys for Criminal
27   Justice v. Butts, 195 F.3d 1039, 1049-50 (9th Cir. 2000) (finding police officers' reliance on
     training materials permitting unconstitutional interrogation procedures not objectively
28   reasonable).

a substantial risk of serious harm to plaintiff by refusing to move him from his cell either before or during their use of OC in connection with Hall's cell extraction. Accordingly, summary judgment will be entered in favor of defendants with respect to this claim.

>   2.   <u>Refusal to Provide Plaintiff with Medical Care After OC Exposure</u>

Plaintiff claims that defendants Wilson and Ayaay acted with deliberate indifference to his serious medical needs when, several hours after the cell extraction, he told them that as a result of his exposure to OC his eyes, throat and nose were burning, and he had stomach and head pain, but defendants refused to provide him with immediate medical care. Defendants argue they did not know of and disregard a substantial risk of harm to plaintiff because plaintiff's symptoms were not consistent with the symptoms experienced by individuals exposed to OC and plaintiff was not suffering from a medical emergency.

In support of their argument, defendants have produced evidence showing that between 6:00 p.m. and 8:00 p.m., at least three hours after Hall's cell extraction, Wilson escorted Ayaay through the facility so that she could distribute over-the-counter medications to inmates. Plaintiff complained to Ayaay that he was suffering from symptoms of exposure to OC and needed medical care; Ayaay determined, however, that plaintiff did not require immediate medical attention. Specifically, Ayaay states the following in her declaration in support of the motion for summary judgment:

> I am familiar with the symptoms caused by exposure to Oleoresin Capsicum (OC) pepper spray. As an LVN [Licensed Vocational Nurse] at SVSP, I have personally been exposed to OC and know these symptoms first-hand. In addition, I have treated inmates suffering from high and direct OC exposure; their respiratory functions are clearly impaired to a point that their speech is overtly affected and their breath is short. Also, the inmate's eyes may be red and watery. In these situations, I provide the inmate with oxygen gas, and fresh running water to flush out any chemicals, and fresh air. If necessary, I take the inmate to the emergency room.
>
> On February 3, 2005, I was working as an LVN at SVSP Facility D. At approximately 6:30 p.m., I was helping to pass out "carry" medications (over-the-counter-drugs) to inmates. Keith Candler (Plaintiff) is an EOP [Enhanced Outpatient Program] inmate and receives regular medication. When Plaintiff complained of symptoms brought on by OC exposure, he was calm and his speech and respiratory functions were clearly normal and unaffected. Also, his eyes were not red or watery. Upon recognizing that Plaintiff was not suffering any serious or overt symptoms due to OC exposure, I offered him a sick-call slip for a non-emergency medical visit.

1    At no time during my shift on February 3, 2005, did any other inmate complain
2    of exposure to OC.  At no time during this shift did any inmate – including
     Plaintiff – exhibit obvious, physical effects from the use of OC.

3    (Ayaay Decl. ¶¶ 3-5.)

4         Wilson, who also is familiar with the effects of OC through his experience as a

5    correctional officer, agreed with Ayaay that plaintiff was not displaying any symptoms of OC

6    exposure.  (Wilson Decl. ¶ 13.)

7         Further, the symptoms plaintiff described when he filled out a sick-call slip the day

8    following Hall's cell extraction, a cough, sore throat, runny nose and headache, are, in

9    Ayaay's opinion, consistent with a common cold and did not constitute a medical emergency.

10   (Ayaay Decl. ¶ 7.)

11        "A difference of opinion between a prisoner-patient and prison medical authorities

12   regarding treatment does not give rise to a § 1983 claim."  Franklin v. Oregon, 662 F.2d

13   1337, 1344 (9th Cir. 1981).  Moreover, a claim of medical malpractice or negligence is

14   insufficient to make out a violation of the Eighth Amendment.  Toguchi v. Chung, 391 F.3d

15   1051, 1060-61 (9th Cir. 2004).  Isolated occurrences of neglect may constitute grounds for

16   medical malpractice, but they do not rise to the level of unnecessary and wanton infliction of

17   pain.  O'Loughlin v. Doe, 920 F.2d 614, 617 (9th Cir. 1990).

18        Here, the undisputed evidence shows that neither Wilson nor Ayaay acted with

19   deliberate indifference to plaintiff's serious medical needs when they determined he did not

20   require immediate medical care for his symptoms.  Even if plaintiff told defendants that his

21   eyes, throat and nose were burning and that he had stomach and head pain, plaintiff has

22   produced no evidence showing that he displayed any of the symptoms associated with OC

23   exposure, let alone that defendants knew plaintiff was at risk of serious harm as a result of

24   OC exposure. Consequently, defendants' refusal to provide plaintiff with immediate medical

25   care does not show they deliberately ignored his request; rather, the evidence shows

26   defendants relied on their experience with symptoms of OC exposure to determine that

27   plaintiff's symptoms were not the result of OC exposure and did not constitute a medical

28

emergency.[9]  In so doing, defendants did not knowingly disregard a substantial risk of harm to plaintiff.

In sum, plaintiff has failed to raise a triable issue of fact as to whether defendants knew plaintiff was suffering from symptoms of OC exposure that posed a serious risk to his medical needs yet nevertheless deliberately ignored that risk, and, consequently, defendants are entitled to summary judgment with respect to this claim as well.

Accordingly, for the reasons set forth above, the Court will enter judgment in favor of defendants Lewis, O'Kane, Hughes, Wilson and Ayaay on plaintiff's claims of deliberate indifference to his serious medical needs.[10]

G.    Defendant McAnelly's Motion to Dismiss

In his complaint, plaintiff makes the following allegations with respect to defendant McAnelly:  On April 1, 2005, McAnelly took two legal practice guide books from plaintiff's cell and never returned them.  Plaintiff needed the books in order to file a petition for a writ of habeas corpus he was pursuing to be released from administrative segregation.  Because of plaintiff's lack of education and his mental health issues, he is unable to enforce his legal rights without access to materials that provide him with guidance concerning legal procedures; consequently, without his legal books he was unable to pursue his habeas corpus petition.  (Compl. at 8-10.)

In the order of service, the Court found plaintiff stated a claim against defendant McAnelly for denial of access to the courts.[11]  McAnelly now moves to dismiss plaintiff's

_____

[9]Indeed, plaintiff has produced no evidence as to what, if any, treatment at that point would have ameliorated plaintiff's symptoms, or that his condition was in any way aggravated by any lack of medical care at that time or thereafter.

[10]In light of the finding that no constitutional violation occurred, the Court does not reach defendants' argument that they are entitled to qualified immunity on plaintiff's claims. See Saucier v. Katz, 533 U.S. 194, 202 (2001) ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity.")

[11]The constitutional source of the right of access to the courts is not settled.  See Christopher v. Harbury, 536 U.S. 403, 413-14 & 415 n.12 (2002).  Supreme Court decisions have grounded the right in the Article IV Privileges and Immunities Clause, the First

United States District Court
For the Northern District of California

16

claim on the ground plaintiff has failed to exhaust his administrative remedies.

### 1.   Standard of Review

Nonexhaustion under § 1997e(a) is an affirmative defense; defendants have the burden of raising and proving the absence of exhaustion.  Wyatt v. Terhune, 315 F.3d 1108, 1119 (9th Cir. 2003).  A nonexhaustion defense should be raised in an unenumerated Rule 12(b) motion.  Id.  In deciding such a motion, the district court may look beyond the pleadings and decide disputed issues of fact.  Id. at 1119-20.[12]  If the court concludes the prisoner has failed to exhaust his nonjudicial remedies, the proper remedy is dismissal of the complaint without prejudice.  Id. at 1120.

### 2.   The Exhaustion Requirement

The Prison Litigation Reform Act of 1995, Pub. L. No. 104-134, 110 Stat. 1321 (1996) ("PLRA") provides: "No action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  Exhaustion is mandatory and not left to the discretion of the district court.  Woodford v. Ngo, 126 S. Ct. 2378, 2382 (2006).  Exhaustion is a prerequisite to all prisoner lawsuits concerning prison life, whether such actions involve general conditions or particular episodes, whether they allege excessive force or some other wrong, and even if they seek relief not available in grievance proceedings, such as  money damages.  Porter v. Nussle, 534 U.S. 516, 524 (2002).  An action must be dismissed unless the prisoner exhausted his available administrative remedies before he filed suit, even if the prisoner fully exhausts while the suit is pending.  McKinney v. Carey, 311 F.3d 1198, 1199 (9th Cir. 2002).

Amendment Petition Clause, the Fifth Amendment Due Process Clause, and the Fourteenth Amendment Equal Protection and Due Process Clauses.  Id. at 415 n.12 (citing cases).

[12]If the court looks beyond the pleadings in deciding an unenumerated motion to dismiss for failure to exhaust, the court must give the prisoner fair notice of his opportunity to develop a record.  Id. at 1120 n.14.  Plaintiff was given such notice by this Court in the Order of Service.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

The Supreme Court has held the exhaustion requirement cannot be satisfied "by filing an untimely or otherwise procedurally defective administrative grievance or appeal." Woodford, 126 S. Ct. at 2382.  Rather, "proper exhaustion" of available administrative remedies is required.  Id. at 2387.  "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings."  Id. at 2386 (footnote omitted); see Jones v. Bock, 127 S. Ct. 910, 923 (2007) (holding prison's grievance process defines boundaries of proper exhaustion).

The State of California provides its prisoners and parolees the right to appeal administratively "any departmental decision, action, condition or policy perceived by those individuals as adversely affecting their welfare."  Cal. Code Regs. tit. 15, § 3084.1(a).  In order to exhaust available administrative remedies within this system, a prisoner must proceed through several levels of appeal: (1) informal review, (2) first formal written appeal on a CDC 602 inmate appeal form, (3) second formal level appeal to the institution head or designee, and (4) third formal level appeal to the Director of the California Department of Corrections and Rehabilitation ("Director").  See Barry v Ratelle, 985 F. Supp 1235, 1237 (S.D. Cal. 1997) (citing Cal. Code Regs. tit. 15, § 3084.5).  A final decision from the Director's level of review satisfies the exhaustion requirement under § 1997e(a).  See id. at 1237-38.

       3.   Analysis

McAnelly argues plaintiff did not exhaust his administrative remedies because he did not receive a decision from the Director's level of review concerning his claim that he was denied access to the courts.

In support of his argument, McAnelly submits the declaration of T. Variz ("Variz"), an Appeals Coordinator at SVSP.  As part of his duties, Variz maintains the computer database in the SVSP inmate appeals office.  (Decl. T. Variz Supp. Mot. Dismiss ("Variz Decl.") ¶ 1.)  According to Variz, the computer database tracks inmate appeals that are filed at SVSP and meet the criteria for review under the California Code of Regulations.  (Id. ¶ 2.)

18

Variz has attached to his declaration a printout from the computer database showing plaintiff's inmate appeals history at SVSP; the report shows that during the time plaintiff was housed at SVSP he filed fifty-nine inmate appeals, twenty-five of which met the criteria for review under the California Code of Regulations and were assigned an institutional log number and tracked in the SVSP appeals database.  (Id. ¶ 5 & Ex. A.)  According to the report, plaintiff exhausted through the Director's level of review five of the appeals that he brought while housed at SVSP, and none of those appeals concerned a property claim.  (Id.)

In particular, Variz attaches to his declaration a copy of appeal No. SVSP 05-2867, which shows the appeal concerned the confiscation of two of plaintiff's legal books by McAnelly and that such appeal was denied on the merits at the second level of review on September 16, 2005. (Id. ¶ 6 & Ex. A at 4.)  The report further shows that plaintiff did not exhaust appeal No. SVSP 05-02867 through the Director's level of review; rather, the appeal was reviewed only through the second level of review, (id.), at which level it was denied for the reason plaintiff had failed to provide evidence that he had been in possession of the two legal books he claimed were confiscated, and also failed to provide documentation that said books had been confiscated by McAnelly, (id. ¶ 7 & Ex. B at 1-2).

Additionally, McAnelly submits a declaration by N. Grannis ("Grannis"), Chief of the Inmate Appeals Branch ("IAB") at the California Department of Corrections and Rehabilitation.  According to Grannis, the IAB keeps an electronic record of each inmate appeal that has proceeded through the final level of review, also referred to as  the Director's level of review, within the administrative appeal system since 1997.  (Decl. N. Grannis Supp. Mot. Dismiss ("Grannis Decl.") ¶ 3.)  The records are made at or near the time that the inmate grievances are investigated and decided.  (Id. ¶ 4.)  Grannis has attached to his declaration the IAB computer printout of a report that dates back to August 1997, showing each inmate appeal filed by plaintiff that completed all levels and review and culminated in a final review at the Director's level of review.  (Id. ¶ 5 & Ex. A.)  The report shows that since August 1997, plaintiff has submitted six appeals culminating in final review at the Director's level of review, and that none of those appeals concerns a property claim.  (Id. ¶ 6 & Ex. A.)

United States District Court
For the Northern District of California

Grannis also has attached to his declaration the IAB computer printout of a report that dates back to August 2000, showing each inmate appeal that was submitted to the Director's level of review by plaintiff and was screened out, that is, rejected for procedural reasons.  (Id. ¶ 7 & Ex. B.)  The report shows that since August 2000, the IAB screened out fourteen appeals submitted by plaintiff; only one of those appeals, identified as appeal No. SVSP 05-2867, the appeal at issue here, concerns a property claim.  (Id.)  According to the report the appeal was received at the Director's level of review on November 14, 2005, and was screened out because it was incomplete.  (Id.)

Plaintiff offers no evidence to the contrary.[13]  In particular, plaintiff does not dispute that appeal No. SVSP 05-2867 was rejected on procedural grounds and thus was not addressed on its merits at the Director's level of review.  Rather, plaintiff argues that the Director did not have authority under the California Code of Regulations to reject the appeal on the ground that plaintiff had failed to attach proper documentation to the appeal in support of his claim.

In reply, McAnelly points to the California Code of Regulations title 15, § 3084.3(c)(5), which section provides that an appeal may be rejected if "[t]he appeal is incomplete or necessary supporting documents are not attached."  Accordingly, McAnelly

_____

[13]On November 7, 2007, plaintiff filed two documents, one titled "Motion for Permission to file Motion for Reconsideration," and the other titled "In Re: Motion for Permission to File Motion for Reconsideration."  (Docket Nos. 65 & 66.)  In the former, plaintiff states he is seeking permission to file a motion for reconsideration pursuant to Northern District of California Local Rule 7-9; in the latter, plaintiff explains he is moving for reconsideration of McAnelly's motion to dismiss on the ground that he has "found documents related" to the motion to dismiss that he did not present with his opposition.  Local Rule 7-9 allows for the filing of motions for reconsideration only with respect to interlocutory orders made in a case prior to the entry of final judgment.  See Civil L.R. 7-9(a).  Here, no interlocutory order had been filed concerning McAnelly's motion to dismiss at the time plaintiff filed his motion for reconsideration; accordingly, the Court construes plaintiff's motion as a request to file a supplemental opposition in response to the motion to dismiss.  As plaintiff has not, however, described the documents he found nor explained how such documents show that his claim was properly exhausted, the motions will be denied.  Cf. Margolis v. Ryan, 140 F.3d 850, 853 (9th Cir. 1998) (holding party seeking continuance to file opposition to motion for summary judgment under Federal Rule of Civil Procedure Rule 56(f) must make clear "what information is sought and how it would preclude summary judgment.")

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1  argues, plaintiff did not properly exhaust his appeal, and was required to resubmit his appeal

2  to the Director's level of review with the proper documents.

3       In sum, the undisputed evidence demonstrates, as a matter of law, that plaintiff did not

4  exhaust his administrative remedies with respect to his claim that he was denied access to the

5  courts, because the appeal was rejected on procedural grounds at the Director's level of

6  review.  Moreover, even assuming, arguendo, that plaintiff did properly present the claim for

7  review and the appeal was improperly rejected on procedural grounds, the claim is

8  unexhausted because the undisputed evidence shows that appeal No. SVSP 05-02867 was

9  still pending at the Director's level of review when plaintiff filed the instant action.

10  Specifically, plaintiff filed his complaint on October 12, 2005; the IAB computer printout of

11  plaintiff's screened out appeals shows, however, that appeal No. SVSP 05-2867 was not

12  received at the Director's level of review until November 14, 2005, and the Director's-level

13  response was not mailed back to plaintiff until January 21, 2006.  (Variz Decl. Ex. B.)

14       As noted, the Supreme Court made clear in Woodford that exhaustion is mandatory

15  and no longer left to the discretion of the district court.  See Woodford, 126 S. Ct. at 2382.

16  Consequently, because it is undisputed that plaintiff did not properly exhaust all of his

17  available administrative remedies before filing suit, his claim that he was denied access to the

18  courts must be dismissed.  See McKinney, 311 F.3d at 1199.  Accordingly, the Court will

19  grant McAnelly's motion to dismiss.

**CONCLUSION**

20

21       For the reasons stated, the Court orders as follows:

22       1.  Defendants Hughes, O'Kane, Lewis, Wilson and Ayaay's motion for summary

23  judgment is hereby GRANTED.  (Docket no. 37.)

24       2.  Defendant McAnelly's motion to dismiss for failure to exhaust administrative

25  remedies is hereby GRANTED.  (Docket No. 37.)

26       3.  Plaintiff's motion for reconsideration, construed as a motion to file a supplemental

27  opposition to defendant McAnelly's motion to dismiss, is hereby DENIED.  (Docket Nos. 65

28  & 66.)

**United States District Court**
For the Northern District of California

1      This order terminates Docket Nos. 37, 65 and 66.

2      The Clerk shall close the file.

3      IT IS SO ORDERED.

4  DATED: March 31, 2008

5

6                      MAXINE M. CHESNEY
                    United States District Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28